UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ANDREW N. MARTIN-SMITH, et al., | |
| Plaintiffs, | 2:10-CV-00403-PMP-VCF |
| v. | |
| RAMCOR SERVICES GROUP, INC., | |
| Defendant. | ORDER |

Before the Court is Defendant Ramcor Services Group, Inc.'s Motion for Partial Summary Judgment (Doc. #58), filed on January 26, 2012. Plaintiffs filed an Opposition (Doc. #64) on February 24, 2012. Defendant filed a Reply (Doc. #67) on March 16, 2012.

**I. BACKGROUND**

Plaintiffs are security guards and dispatchers who worked for Defendant Ramcor Services Group, Inc. ("Ramcor"), which provides services to the United States government under various contracts. (Mot. Summ. J. (Doc. #58) ["MSJ"], Ex. A at 1.) In July 2000, Ramcor was awarded a contract to provide security services to Veterans Affairs ("VA") clinics and one VA hospital located in Southern Nevada. (MSJ, Ex. A at 1, Ex. E.) Ramcor provided services at the Southern Nevada VA locations under successive contracts and extensions from July 2000 through December 31, 2009. (MSJ, Ex. A at 1, Ex. D at 66.)

Ramcor provided security services at the various VA clinics in the area using its own employees. (MSJ, Ex. C at 21.) Ramcor contracted with American Security & Protective Services, Inc. ("ASPS") to provide security services under the VA contract at the Michael O'Callaghan Federal Hospital ("Hospital") at Nellis Air Force Base. (MSJ, Ex.

at 1, Ex. C at 11.) Ramcor contracted with ASPS because ASPS had a license issued by the Nevada Private Investigator Licensing Board which, at the time of the initial contract, Ramcor and ASPS believed Ramcor needed to fulfill the contract. (MSJ, Ex. C at 36, Ex. D at 92.) ASPS later determined no such local license was needed for work on federal property. (MSJ, Ex. C at 36.) However, Ramcor's VA contract manager, Michael Potocki ("Potocki"), believed that all the employees in Clark County were required to be registered with the licensing board. (MSJ, Ex. D at 93-94.) All Ramcor and ASPS employees working in Clark County under the VA contract were registered under ASPS's license. (Id.)

In the months leading up to the time Ramcor's contract with the VA expired, Ramcor employed forty individuals at the VA clinics in Southern Nevada, thirty-three of whom were full-time employees. (MSJ, Ex. G at 2.) Ramcor also employed hundreds of employees at various other contract locations unrelated to the VA contract. (Id.)

ASPS employed twenty-five employees for the contract work at the Hospital, approximately twenty of whom were full-time employees. (MSJ, Ex. A at 1, Ex. D at 142.) ASPS paid these employees' salaries through ASPS's payroll, and submitted the bill to Ramcor. (MSJ, Ex. A at 1, Ex. C at 12.) ASPS is a corporation owned by Anthony Galante ("Galante") and Steve Rybar. (MSJ, Ex. C at 6-9.) Ramcor does not own or operate ASPS. (Id. at 10.) In addition to the services ASPS provided at Nellis Air Force Base, ASPS provided security services unrelated to the Ramcor contract at apartment complexes, shopping centers, and other locations, for which ASPS employed approximately 250 other employees. (Id. at 8, 49-50.) ASPS did not interview or hire any Ramcor employees, except perhaps a few who worked an extra shift at the Hospital. (Id. at 13, 15.) Any Ramcor employees who worked an extra shift at the Hospital were paid through ASPS's separate payroll. (Id. at 15, 18.) Likewise, a few ASPS employees sometimes moonlighted for Ramcor at the VA clinics, and any ASPS employees working a shift for Ramcor were

paid through Ramcor's payroll.  (MSJ, Ex. D at 38-40.)  Potocki was paid by Ramcor.  (Id. at 9.)

Ramcor supervisors did not supervise ASPS security guards at the Hospital, and ASPS supervisors did not supervise Ramcor employees at any of the VA clinics.  (MSJ, Ex. C at 20-21.)  Potocki acted as the liaison between the VA and Ramcor.  (MSJ, Ex. D at 7.)  Consequently, Potocki occasionally would go to the Hospital if the VA or the Air Force wanted to make a change regarding the services being provided at the Hospital.  (MSJ, Ex. C at 21-22.)  Potocki would bring contract compliance issues to ASPS's attention, but he then left it to ASPS to ensure action was taken.  (MSJ, Ex. D at 18.)  Day-to-day supervision at the Hospital was controlled by ASPS.  (MSJ, Ex. C at 47.)  For example, ASPS controlled its own scheduling, employee vacations, payroll, and employee discipline.  (MSJ, Ex. D at 12, 139-40.)

ASPS and Ramcor security guards wore the same uniforms, including a patch bearing the names of both ASPS and Ramcor.  (MSJ, Ex. C at 26-27; Pls.' Opp'n to Mot. Summ. J. (Doc. #64), Ex. 4.)  Although the uniforms looked the same, each company paid for its own employees' uniforms.  (MSJ, Ex. C at 26-27.)  ASPS and Ramcor used the same type of equipment, as required by the VA, but each company paid for its own employees' equipment.  (Id. at 44-45, 49.)  Ramcor used ASPS storage space to stow some excess equipment in 2008.  (MSJ, Ex. D at 98-99.)  Potocki provided training to both Ramcor and ASPS employees, but it was up to ASPS to ensure that its employees received the necessary training.  (MSJ, Ex. C at 27-28, Ex. D at 13-15.)  ASPS paid its employees for training time, which Ramcor then reimbursed under the VA contract.  (MSJ, Ex. C at 28-29.)

ASPS had a separate dispatch from Ramcor's dispatch in a different physical location.  (MSJ, Ex. C at 37-38, Ex. S at 78-79.)  If Ramcor's dispatch needed to communicate with ASPS's dispatch, they talked by telephone.  (MSJ, Ex. C at 38.)  This did not occur often, but the two dispatches may have communicated if, for example, a

1  disruptive patient was being transferred from a clinic to the Hospital or vice versa. (MSJ,
2  Ex. D at 102-03.)

3  Ramcor's last contract with the VA commenced in 2007, and was extended
4  through May 30, 2009. (Id. at 145.) In May 2009, the VA extended Ramcor's contract to
5  the end of November 2009. (Id.) Ramcor knew it either would have to rebid on the
6  contract or the contract would have to be extended again for Ramcor to keep the contract
7  beyond November 2009. (Id. at 145-46.) Ramcor's in-house counsel did not believe
8  Ramcor knew the contract would be rebid until Ramcor received a solicitation for bids in
9  November 2009. (MSJ, Ex. B at 22-24.) However, Ramcor supervisors knew as early as
10 June or July of 2009 that the contract would be up for rebid. (MSJ, Ex. O at 37-38.)

11 On November 16, 2009, the United States government solicited bids for the VA
12 security services contract at the Southern Nevada VA clinics and the Hospital. (MSJ, Ex. A
13 at 2, Ex. B at 21, Ex. E.) In early December, Potocki and Galante took another interested
14 bidder, Culpepper & Associates ("Culpepper"), on a tour of the locations covered by the
15 contract. (MSJ, Ex. C at 32-33.) Ramcor timely submitted a bid for the contract before the
16 December 4, 2009, deadline. (MSJ, Ex. A at 2, Ex. D at 84-85, Ex. F.)

17 On December 9, 2009, the United States informed Ramcor that it was not
18 awarded the contract. (MSJ, Ex. A at 2, Ex. I.) Instead, the United States awarded the
19 contract to Culpepper. (MSJ, Ex. B at 13, Ex. I.) On December 11, 2009, Ramcor notified
20 its employees that Ramcor did not win the contract and that their last day of employment
21 with Ramcor would be December 31, 2009. (MSJ, Ex. A at 2, Ex. D at 87, Ex. V.) Ramcor
22 ceased providing services under the contract on December 31, 2009, and Culpepper began
23 providing services under its new contract on January 1, 2010. (MSJ, Ex. D at 88-89.)

24 Ramcor employees were notified that they could schedule an interview with
25 Culpepper, and all Plaintiffs except Steven Phelps arranged an interview. (MSJ, Ex. K 1-2,
26 Ex. V.) All Plaintiffs who arranged an interview, other than Andrew Martin-Smith

4

("Martin-Smith"), were offered and accepted employment with Culpepper. (MSJ, Ex. K at 2.) Martin-Smith attended his interview with Culpepper, but when he learned his pay would drop approximately $8 per hour with no benefits, he terminated the interview. (MSJ, Ex. L at 13-15.) The drop in pay resulted from a VA-mandated change in most positions from the higher paying position of "Guard II" to the lower paying "Guard I," and it was a change that would have occurred even if Ramcor had won the contract. (MSJ, Ex. O at 63, Ex. S at 97-100.)

Plaintiffs brought suit in this Court on February 23, 2010, asserting Ramcor violated the Worker Adjustment and Retraining Notification ("WARN") Act for failing to give a sixty-day notice of a plant closing or mass layoff (count one). Plaintiffs also allege Ramcor violated the Fair Labor Standards Act ("FLSA") by (1) requiring employees to show up fifteen minutes prior to their shift for a debriefing but not compensating for this time and (2) not compensating for all training hours (count two). Finally, Plaintiffs assert Ramcor violated the Contract Work Hours and Safety Standards Act ("CWHSSA") by willfully failing to pay the wages earned during the uncompensated training and fifteen minute debriefing period (count three).

Ramcor now moves for summary judgment on Plaintiffs' WARN Act claim. Ramcor argues there was no termination of employment because each employee had a right of first refusal to continue working at Culpepper, which most employees and all Plaintiffs except Martin-Smith accepted, resulting in nearly all employees not missing a single day of paid employment. Ramcor further contends that no genuine issue of material fact remains that Ramcor did not employ fifty or more full-time employees so as to trigger the WARN Act's application because it is not a joint employer with ASPS. Ramcor also argues that even if Ramcor had fifty or more employees, Ramcor's activity falls within an exception to the WARN act for unforeseeable business circumstances leading to the layoff. Ramcor argues that because it maintained the contract with the VA for many years, had excellent

5

1  reviews, and was given no indication that its contract was in jeopardy, the loss of the
2  contract was not foreseeable.
3       Ramcor also moves for summary judgment on Plaintiffs' FLSA and CWHSSA
4  claims.  As to training, Ramcor contends no genuine issue of fact remains that Plaintiffs
5  were paid for all training hours.  As to the fifteen minute debriefing, Ramcor argues three
6  Plaintiffs admitted they were not required to arrive fifteen minutes early for their shifts, and
7  thus Ramcor is entitled to summary judgment on this issue with respect to these three
8  Plaintiffs.
9       Plaintiffs respond that genuine issues of fact remain as to whether Ramcor and
10 ASPS are a single employer such that the WARN Act's fifty-employee requirement is met
11 because Ramcor and ASPS shared common management, used interchangeable equipment,
12 the guards' uniforms stated they were both Ramcor and ASPS employees, and Ramcor
13 depended on ASPS for a license which Ramcor needed to provide security services under
14 the VA contract.  Plaintiffs contend it is irrelevant that the employees accepted immediate
15 employment with Culpepper in determining whether the employees suffered a loss of
16 employment because Ramcor terminated Plaintiffs and because the new employment was
17 on unfavorable terms given that a majority of the employees were offered new positions at
18 lower pay.  Plaintiffs further argue Ramcor's failure to provide notice is not excused
19 because issues of fact remain as to when Ramcor knew its contract was up for bid, and it
20 was reasonably foreseeable that Ramcor could lose the contract.
21      As for the FLSA and CWHSSA claims, Plaintiffs concede no issue of fact
22 remains that Ramcor paid Plaintiffs for their training hours.  However, Plaintiffs contend
23 issues of fact remain as to the three Plaintiffs whom Ramcor identified as conceding
24 Ramcor did not require them to show up fifteen minutes early.  Plaintiffs argue other
25 employees testified Ramcor required its employees to arrive early to get a debriefing from
26 the last shift, and the fact these particular employees arrived early without specifically being

1 told to do so does not negate the fact that they worked for those fifteen minutes and were
2 not compensated.  Plaintiffs also argue one of these Plaintiffs testified that he was
3 instructed by one supervisor to arrive early, and only later was advised that arriving early
4 was not required.  Plaintiffs contend that should affect only this Plaintiff's damages, not the
5 viability of his claim.

**II. DISCUSSION**

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. Id.  The Court views all evidence in the light most favorable to the non-moving party. Id.

**A.  WARN Act**

The WARN Act requires certain employers to provide sixty-days' notice to employees prior to a "plant closing" or a "mass layoff." 29 U.S.C. § 2102(a).  An employer who fails to comply with the WARN Act's provisions is liable to each affected former employee for back pay and benefits for up to sixty days, plus attorney's fees. Id. § 2104(a).

A "plant closing" means "the permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time

employees." Id. § 2101(a)(2). A "mass layoff" means:

> a reduction in force which--
>    (A) is not the result of a plant closing; and
>    (B) results in an employment loss at the single site of employment during any 30-day period for--
>       (i)(I) at least 33 percent of the employees (excluding any part-time employees); and
>       (II) at least 50 employees (excluding any part-time employees); or
>       (ii) at least 500 employees (excluding any part-time employees)[.]

Id. § 2101(a)(3). Consequently, whether it is a plant closing or a mass layoff, at least fifty full-time employees must be affected for the WARN Act's notice requirement to be triggered.

Under the single employer test, multiple companies may be treated as a single employer under the WARN Act. Childress v. Darby Lumber, Inc., 357 F.3d 1000, 1005-06 (9th Cir. 2004). Generally, the WARN Act treats an independent contractor as a separate employer from the contracting company. 20 C.F.R. § 639.3(a)(2). However, to determine whether two companies ought to be treated as a single employer, the fact finder considers "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." Id. The first factor is the "least important," and the other factors are "guideposts only." Childress, 357 F.3d at 1005 (citation omitted). The inquiry "ultimately depends on all the circumstances of the case and is characterized as an absence of an arms length relationship found among unintegrated companies." Id. at 1005-06 (citation omitted).

No issue of fact remains that Ramcor employed thirty-three full-time employees and ASPS employed twenty full-time employees under the VA contract during the WARN notification period in late 2009. Consequently, no genuine issue of material fact remains that neither company independently employed enough affected employees to trigger the

1 WARN Act's application.  However, if Ramcor and ASPS are a single employer, the
2 WARN Act would apply.
3     Plaintiffs do not dispute that Ramcor and ASPS do not share common ownership
4 or common directors and/or officers.  Accordingly, no reasonable fact finder could find
5 either of the first two factors of the single employer test favor Plaintiffs.
6     As to the third factor, no genuine issue of fact remains that Ramcor did not
7 exercise de facto control over ASPS.  The evidence shows that Ramcor exercised some
8 control over ASPS, but nothing beyond the normal control a contractor would exercise over
9 a subcontractor.  Potocki, as contract manager and liaison with the VA regarding the
10 contract, would bring contract compliance issues to ASPS's attention.  However, Potocki
11 testified he would let ASPS ensure action was taken to be in compliance.  Plaintiffs present
12 no contrary evidence.  Ramcor supervisors did not supervise ASPS employees, and vice
13 versa.  Plaintiffs present some deposition testimony that Ramcor supervisors visited the
14 Hospital, but none of those deponents had personal knowledge as to what the Ramcor
15 supervisors did at the Hospital.  (MSJ, Ex. L at 68-69, Ex. M at 39-41.)  Potocki and the
16 Ramcor supervisors testified they did not exercise any managerial control over the Hospital
17 employees.  (MSJ, Ex. D at 16-17, Ex. O at 10, 14, 20, Ex. S at 42, 63-65.)  No one testified
18 that the Hospital supervisors exercised managerial control over Ramcor employees, except
19 when those employees worked an extra shift at the Hospital.  Under those circumstances,
20 the employee was treated as an ASPS employee paid through ASPS's payroll.  Likewise,
21 whenever an ASPS employee moonlighted for Ramcor, the employee was treated as a
22 Ramcor employee paid through Ramcor's payroll.  Consequently, no reasonable fact finder
23 could find the third factor weighs in Plaintiffs' favor.
24     As to the fourth factor, no genuine issue of fact remains that personnel policies
25 did not emanate from a common source.  To the extent rules and regulations pertaining to
26 the job were identical, that emanated from the VA's requirements under the contract, not

from the integrated nature of the two companies.  Ramcor and ASPS employees wore the same type of uniform, carried the same type of equipment, and jointly trained because the employees of both companies operated under the VA's requirements for providing security services under the contract.  But each company independently paid for its employees' uniforms, equipment, and training time through their separate payrolls.  Personnel issues such as scheduling, vacations, payroll, employee discipline, and day-to-day supervision of operations were handled separately in each company.  Consequently, no reasonable fact finder could find the fourth factor weighs in Plaintiffs' favor.

Finally, no genuine issue of fact remains that the two companies' operations were independent.  Plaintiffs present evidence that Ramcor needed to subcontract with ASPS because Ramcor did not have the required license to perform security patrol services in Nevada, and thus Ramcor depended on ASPS for the license.  ASPS had the required license, but it depended on Ramcor to secure the VA contract.  However, this dependence is no more than an ordinary contractor/subcontractor relationship.  The contractor obtains the overall contract, and obtains specialized services from subcontractors.  Significantly, the two companies had operations well beyond the VA contract in Southern Nevada.  Ramcor employed hundreds of employees at various other contract locations unrelated to the VA contract.  ASPS provided security services unrelated to the VA contract at apartment complexes, shopping centers, and other locations, for which ASPS employed approximately 250 other employees.  There is no evidence that the two companies' operations at these other sites had any relationship whatsoever, much less a dependency relationship.  Accordingly, no reasonable fact finder could find the fifth factor weighs in Plaintiffs' favor.

No issues of fact remain that none of the five factors weigh in favor of finding Ramcor and ASPS are a single employer.  No reasonable fact finder could conclude the contractor/subcontract relationship between Ramcor and ASPS was anything but an arms length relationship between two unintegrated companies.  Because no issue of fact remains

that Ramcor and ASPS are not a single employer, and neither company on its own employed fifty or more affected employees, the WARN Act does not apply as a matter of law.  The Court therefore will grant Ramcor's Motion for Summary Judgment on Plaintiffs' WARN Act claims in count one of Plaintiffs' Complaint.

### B.  FLSA and CWHSSA

#### 1.  Training

Plaintiffs concede no issue of fact remains that Ramcor compensated Plaintiffs for all training time.  The Court therefore will grant Ramcor's Motion for Summary Judgment on counts two and three with respect to this issue.

#### 2.  Fifteen Minute Debriefing

Ramcor contends that Plaintiffs Steven Phelps ("Phelps") and Martin Mummert ("Mummert") admitted they were not required to report fifteen minutes early for their shifts, and therefore Ramcor is entitled to summary judgment as to these Plaintiffs on the fifteen minute debriefing issue.  Ramcor further argues that Plaintiff Kenneth Moreland ("Moreland") testified one of his supervisors specifically told him he was not required to arrive fifteen minutes early, and thus Ramcor is entitled to summary judgment on this issue as to Moreland.

Plaintiffs respond that because other employees testified arriving fifteen minutes early was required, and because Phelps and Mummert testified they in fact arrived early for their shifts so it was not an issue that needed to be addressed with them, issues of fact remain.  As to Moreland, Plaintiffs argue that although one supervisor told him it was not required, another supervisor previously had told Moreland it was required, and thus Moreland's claim is viable, even if his damages are limited to the time between the two supervisors' statements.

///

///

Several Ramcor employees testified that arriving early for the fifteen minute debriefing period was a mandatory Ramcor policy.[1] (MSJ, Ex. L at 26-27, Ex. M at 32-33, Ex. N at 15-17, Ex. P at 40-41, Ex. T at 16-17, Ex. U at 19-22, Ex. Y at 42-44.) Phelps and Mummert each testified they arrived early, and therefore no one at Ramcor ever had to warn or discipline them for not arriving early. Phelps testified:

> As far as I was concerned it was just part of my job that I always did. If I was to look back and try to think of an exact memo or whatever, I do not recall. I just--it's just part of the way I am. I just do it. I didn't think anything more about it.

(MSJ, Ex. X at 19-20.) However, when asked if anyone at Ramcor told Phelps he had to arrive fifteen minutes early, Phelps testified that he "was always there that much early so it was never an issue with me. So if you was to ask me if somebody come out and said--I do not recall." (Id. at 23.) Likewise, when asked whether he had been disciplined for not arriving fifteen minutes early, Phelps stated he had not because "they had no cause to do it, I was always there." (Id. at 24.) Moreover, when asked whether "it was expected for everyone to arrive early," Phelps answered in the affirmative. (Id. at 43.) Mummert likewise testified that he always arrived "way early," and thus "there was never a point where supervisors had to tell me get here earlier." (MSJ, Ex. R. at 30.) Mummert acknowledged that no one at Ramcor ever instructed him to arrive fifteen minutes early, "[b]ut again, they wouldn't have been talking about that subject with me because I show up on time." (Id. at 37.)

Viewing the facts and the reasonable inferences therefrom in the light most favorable to Plaintiffs, a reasonable fact finder could find Phelps and Mummert were subjected to the same fifteen minute debriefing policy as other Ramcor employees, but were

---

[1] Ramcor supervisory employees deny they advised anyone they had to arrive fifteen minutes early for a debriefing. (MSJ, Ex. D at 44, 55-56, Ex. O at 46-48, Ex. S at 33-35.) However, the Court must view the facts in Plaintiffs' favor as the nonmoving parties.

not counseled on the subject because they arrived early.  Phelps testified he was aware that it was Ramcor's policy that he be there early, regardless of his personal work habits on the subject.  Mummert referred to his early arrival as showing up "on time."  Multiple other employees testified that arriving fifteen minutes early was a mandatory requirement imposed by Ramcor.  The Court therefore will deny Ramcor's Motion for Summary Judgment on counts two and three as to Phelps and Mummert on the fifteen minute debriefing issue.

As to Moreland, he testified that one supervisor told him he had to arrive fifteen minutes early.  (MSJ, Ex. Q at 41.)  At some indeterminate time during his employment, Moreland mentioned the fifteen minute policy to a different Ramcor supervisor who advised Moreland that he did not have to be there that early so long as he was not late.  (Id. at 44.)

Viewing this evidence and all reasonable inferences therefrom in the light most favorable to Plaintiffs, a reasonable fact finder could find Moreland was subject to the fifteen minute debriefing requirement for at least some period of time.  Ramcor has failed to meet its initial burden of showing no issue of fact remains that the timing between the two statements was so close that Moreland never was subjected to the policy.  The Court therefore will deny Ramcor's Motion for Summary Judgment as to Plaintiff Moreland on the fifteen minute debriefing issue.

///
///
///
///
///
///
///

### III. CONCLUSION

IT IS THEREFORE ORDERED that Defendant Ramcor Services Group, Inc.'s Motion for Partial Summary Judgment (Doc. #58) is hereby GRANTED in part and DENIED in part. The Motion is granted as to count one, and as to counts two and three of Plaintiffs' Complaint to the extent those counts are based on uncompensated training hours. The Motion is denied in all other respects.

DATED:  September 25, 2012

_____
PHILIP M. PRO
United States District Judge